**WEISS & HILLER, PC**
*Attorneys for Plaintiff*
600 Madison Avenue
New York, New York 10022
(212) 319-4000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMERICAN STEVEDORING, INC.,

                      Plaintiff,

    - against -

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL-CIO, HAROLD J.
DAGGETT (President), STEPHEN KNOTT
(General Vice President), LOUIS PERNICE
(Vice President), NYSA-ILA PENSION FUND,
JOSEPH CURTO (Co-Chairman), PORT POLICE
AND GUARDS UNION, JOHN T. OATES
(President), PAUL PUNTURIERI (Vice President),
NYSA-PPGU PENSION FUND,
MICHAEL FARRINO, and JOSEPH POLLIO,

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**13 CV 0918**

**COMPLAINT**



RECEIVED
FEB 0 7 2013
U.S.D.C. S.D. N.Y.
CASHIERS

      **AMERICAN STEVEDORING, INC. ("American")** by and through its undersigned

attorneys, Weiss & Hiller, PC, alleges as follows:

**INTRODUCTION**

      1.    By this action, American seeks to recover damages and obtain other relief arising

out of Defendants' pattern of racketeering activity at the Brooklyn waterfront, resulting in the

loss of American's business. This pattern of racketeering activity includes, among other things,

establishment of a syndicate linked to organized crime ("Waterfront Group," hereinafter defined

with greater particularity); and use of the Waterfront Group to engage in extortion, harassment,

payoffs, fraud, embezzlement, mail fraud, wire fraud and other illegal activities designed to enrich many members of the syndicate which comprises the Waterfront Group.

2.      Although the Waterfront Group has directed its illegal activities toward multiple objectives over the course of its history, the Complaint herein is directed to recovery of, *inter alia*, damages caused as a result of a particular scheme directed at American by the Waterfront Group, to cause American crippling economic and financial harm, and ultimately, to oust American from its business conducted at the New York and New Jersey Ports ("Scheme"). As reflected below, the Waterfront Group hatched and implemented its Scheme in an effort to coerce American to participate in the Waterfront Group's racketeering activities, and ultimately to retaliate against American when American refused to do so and in response to efforts by American to work with various law-enforcement bodies to eradicate organized crime's pervasive infiltration and influence over Waterfront businesses and organizations.

3.      Many members of the Waterfront Group and/or those organized crime figures associated with it, have been indicted and/or convicted of crimes associated with some of their illegal activities.   In addition, there have been multiple investigations of members of the Waterfront Group and efforts by the federal government to eliminate organized crime's influence over the Waterfront; however, the actions taken against the organization thus far have been ineffective.  That ends today.

**JURISDICTION**

4.      Jurisdiction for this action is predicated upon 18 U.S.C. §1964(a).

**VENUE**

5.      Venue for this action is predicated upon 18 U.S.C. §1965 and 28 U.S.C. §1391.

2

## PARTIES

6.     From in or about 1993 until September 26, 2011, Plaintiff American was a corporation organized and existing under the laws of the State of New York, with principal places of business located in Brooklyn, New York and Newark, New Jersey.

7.     During the aforesaid period, American was a marine terminal operator ("MTO") occupying and operating the Red Hook Marine Terminal ("RHMT"), including Piers 9 and 10 located in Brooklyn, New York ("Brooklyn Terminal"). The RHMT is a 100-acre facility with four active container cranes, over a million square feet of warehouse space and two major bulk handling yards.

8.     During the aforesaid period, American also occupied and operated a terminal on Marsh Street, in Newark, New Jersey ("Newark Terminal") (the Brooklyn Terminal and the Newark Terminal shall collectively be referred to as the "Terminals").

9.     At all relevant times prior to September 26, 2011, as an MTO, American provided, *inter alia*: port operation services; stevedoring and lashing for container, bulk and neo-bulk products; warehouse operations; and related truck, chassis and container support services. At such relevant times herein, American was engaged in the business and management of loading and unloading vessels at the Terminals and facilitating distribution of goods in support of both the foreign and interstate commerce of the United States.

10.     During the aforesaid period, American employed workers associated with the Defendant International Longshoremen's Association ("ILA") and Port Police and Guards Union ("PPGU").

*Defendant ILA*

11.     The ILA is a labor organization or union, as that term is defined in 29 U.S.C.

§402 (i) and (j), which purports to represent longshoremen and other laborers employed by businesses operating at or in connection with working ports throughout the United States. The ILA is the largest union of maritime workers in North America, representing upwards of 65,000 longshoremen on the Atlantic and Gulf Coasts, Great Lakes, major United States rivers, Puerto Rico and Eastern Canada. Organized in 1892 along the Great Lakes, the ILA is affiliated with, *inter alia*, the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO")

12.     Pursuant to the terms of its constitution, the ILA is governed by an Executive Council with broad powers, and is divided into two geographic districts: the Atlantic Coast District and the South Atlantic & Gulf Coast District. Local union chapters of the ILA ("Locals") exist within the two aforesaid and described districts.

13.     Upon information and belief, the ILA's principal office is located at 17 Battery Place, Suite 930, New York, New York 10004.

14.     Officers and Vice Presidents within the ILA Executive Council typically hold one or more other union office at the district or local level and receive substantial salaries for each office. Upon information and belief, many of the ILA senior officials earn in excess of $1 Million each year.

**Defendants ILA Officers**

15. Defendant Harold J. Daggett ("Defendant Daggett") is, and at all relevant times has been, the President of the ILA, and is or has been the Assistant General Organizer of the ILA and President of ILA Local 1804-1.

16.     Defendant Daggett is also an Executive Co-Trustee of the Defendant NYSA-ILA

4

Pension Trust Fund (defined herein).

17.    Upon information and belief, Defendant Daggett is and at all relevant times has been, associated with organized crime.

18.    In or about July 2004, a criminal complaint was filed against Defendant Daggett in the Eastern District of New York, and he was indicted for extortion and mail and wire fraud conspiracy with regard to his activities in connection with the ILA and organized crime. *United States v. Coffey, et al.*, No. 04 Cr. 651 (E.D.N.Y.) (ILG) (Exh. 1).

19.    Upon information and belief, Defendant Daggett is, and at all relevant times has been, a citizen and resident of the State of New Jersey, County of Sussex.

20.    Upon information and belief, Defendant Daggett regularly conducts business in the State of New York.

21.    Upon information and belief, Defendant Stephen Knott ("Defendant Knott") is, and at all relevant times has been, the General Vice-President of the ILA.

22.    Upon information and belief, Defendant Knott has ties to organized crime.

23.    Upon information and belief, Defendant Knott is, and at all relevant times has been, a citizen and resident of the State of New Jersey, County of Bergen.

24.    Upon information and belief, Defendant Knott regularly conducts business in the State of New York.

25.    Upon information and belief, Defendant Louis Pernice ("Defendant Pernice") is, and at all relevant times has been, a Vice President of the ILA and President of ILA Local 1814.

26.    Upon information and belief, Defendant Pernice has ties to organized crime.

27.    Defendant Pernice has entered into a consent decree and has been named as an unindicted co-conspirator in actions brought by the United States in connection with racketeering

activity along the New York and New Jersey Waterfront ("Waterfront").

28.     Upon information and belief, Defendant Pernice has entered into one or more consent decrees resolving such actions commenced against him by the United States government.

29.     Upon information and belief, Defendant Pernice has violated said consent decrees by continuing his association with organized crime and racketeering activity on the Waterfront.

30.     Upon information and belief, Defendant Pernice is, and at all relevant times has been, a citizen and resident of the State of New York, County of Kings.

***Defendant NYSA-ILA Pension Trust Fund***

31.   Upon information and belief, the NYSA-ILA Pension Trust Fund (the "NI Fund") is, and at all relevant times has been, comprised of members from both the New York Shipping Association ("NYSA") and the ILA.

32.     The NI Fund is, and at all relevant times has been, headquartered at 77 Water Street, 16th Floor, in New York, New York.

33.     Upon information and belief, defendant Joseph Curto ("Defendant Curto") is, and at all relevant times has been, a citizen and resident of the State of New Jersey, County of Monmouth, who regularly conducts business in the State of New York.

34.     Upon information and belief, Defendant Curto is, and at all relevant times has been, the President of the NYSA, and an Executive Officer of the NP Fund and the NI Fund. Upon information and belief, Defendant Curto also controls the activities of both the NP Fund and the NI Fund under the direction of Defendant Daggett.

35.     Upon information and belief, the annual reports for the NYSA reflect that Defendant Curto manages labor relations under the Collective Bargaining Agreements with the

ILA and the PPGU, respectively.

36.     Upon information and belief, Defendants Daggett and Curto are Executive Co-Trustees of the NI Fund.

***Defendant PPGU***

37.     The PPGU was originally founded as an ILA Port Watchmen's Local union.

38.     According to the PPGU's website, PPGU is, and at all relevant times herein has been, a New Jersey non-profit corporation, the members of which are tasked with providing, *inter alia*, Port security along the Waterfront.

39.     Upon information and belief, despite that its name is the "Port Police and Guards Union," the PPGU is an organization which represents no police officers.

40.     At all relevant times herein, the PPGU has been headquartered at 889 Broadway, Bayonne, New Jersey.

41.     According to its website, the PPGU "manages" the NYSA-PPGU Pension Fund ("NP Fund").

***Defendant PPGU Officers***

42.     Upon information and belief, Defendant John T. Oates ("Defendant Oates") is, and at all relevant times has been, the President of the PPGU.

43.     Upon information and belief, Defendant Oates is, and at all relevant times has been, a citizen and resident of the State of New York, County of New York.

44.     Upon information and belief, Defendant Oates has ties to organized crime.

45.     Upon information and belief, Defendant Paul Punturieri ("Defendant Punturieri") is, and at all relevant times has been, the Vice President of the PPGU.

46.     Upon information and belief, Defendant Punturieri is, and at all relevant times has

7

been, a citizen and resident of the State of New York, County of New York.

47.    Upon information and belief, Defendant Punturieri has ties to organized crime.

**Defendant NYSA-PPGU Pension Fund**

48.    Upon information and belief, Defendant NP Fund is, and at all relevant times has been, a joint labor-management trust fund for the PPGU, and is headquartered at 889 Broadway, Bayonne, New Jersey.

**Individual Defendants**

49.    Upon information and belief, Defendant Michael Farrino ("Defendant Farrino") is and at all relevant times has been, a principal of MTC Transportation.

50.    Upon information and belief, Defendant Farrino is, and at all relevant times has been, a citizen and resident of the State of New York, County of Queens.

51.    Upon information and belief, Defendant Joseph Pollio ("Defendant Pollio") is, and at all relevant times has been, a citizen and resident of the State of New York, County of New York.

52.    Upon information and belief, Defendant Pollio is, and at all relevant times herein has been, the Vice President of ILA Local 1814 ("Local 1814") and is an Executive Vice President of the ILA Atlantic Coast District.

## CLAIM FACTS

**Control of the Waterfront by the ILA, PPGU and Other
Elements Working with Organized Crime**

53.    The Waterfront is an integrated commercial marketplace composed of several separate ports, including the Ports of New York and New Jersey, occupying a common harbor and encompassing the nation's busiest ports. The Waterfront harbor plays a critical role in the

8

movement of manufactured, agricultural, and other goods throughout the Eastern seaboard and has a major impact on the nation's commerce.[1]

54.     For the purposes of this Complaint, the term "Waterfront" is further defined as the Ports of New York and New Jersey (collectively, the "Port") and all businesses and unions (including their associated trust funds) involved in commerce in the Port ("Waterfront Commerce"), whether located on Port property or not, including but not limited to container repair and storage businesses, stevedoring, chassis repair and storage businesses, trucking businesses, trucking dispatching businesses, and shipping lines and terminals.  The individual members of the unions involved in Waterfront Commerce, including the ILA, the executive members of the ILA, the individual members of the ILA local unions ("Locals") and other ILA subordinate labor organizations, the trustees of the NI Fund, the PPGU, the executive members of the PPGU, the individual members of PPGU Locals and other PPGU subordinate labor organizations, the trustees of the NP Fund and the individual Defendants are referred to herein as the "Waterfront Group."

55.     Notwithstanding its economic importance to the nation, the Waterfront has been the setting for corruption, violence, and illegal abuse of Waterfront labor and businesses by organized crime.  This pattern of racketeering has been facilitated by organized crime's infiltration of, and control and influence over, labor unions, including the ILA, its Executive Officers , the PPGU and its Executive Officers, operating at the Waterfront.

---

[1]*United States v. Local 1804-1, International Longshoremen's Association*, 812 F. Supp. 1303, 1312 (S.D.N.Y. 1993).

56.    The "Mafia" is a nationwide criminal organization that has operated throughout the United States through associates known as "families." Organized crime figures believed to be members of the Mafia have used their control of various labor unions to demand and receive payoffs from employers of union members in exchange for labor peace, to embezzle union funds, and to engage in other racketeering acts, including those described herein.  Since the late 1950s, two families have shared control of the Waterfront.[2]

57.    Upon information and belief, through, *inter alia*, the use of actual and threatened force, violence, and other illegal activities, organized crime has illegally exercised influence over labor unions and businesses at commercial shipping terminals on the Waterfront and elsewhere.

58.    Upon further information and belief, the influence of organized crime on the Waterfront has been facilitated by the Waterfront Group.

59.    While the ILA's motto is "Sobriety, Truth, Justice and Morality," its actions and inactions establish that the ILA and other members of the Waterfront Group have been complicit partners in the pattern of pervasive corruption that has prevailed on the Port for decades.

60.    In a number of instances, members and associates of organized crime "families" have served as ILA and/or PPGU officials or otherwise have been paid advisors to the ILA's and/or the PPGU's associated trust funds.

61.    Upon information and belief, friends and relatives of members and associates of

---

[2]The existence of organized crime was proven in *United States v. Salerno*, No. 85 Cr. 139 (S.D.N.Y.) (RO), *aff'd*, 868 F.2d 524 (2d Cir. 1989) (the "Commission Case"), among others. The existence of crime families was proven in, among other cases, the Commission Case, *United States v. Gallo*, No. 86 Cr. 452 (E.D.N.Y.) (JBW), *aff'd*, 863 F.2d 185 (2d Cir. 1988), *cert. denied*, 109 S. Ct. 1539 (1989) and in *United States v. Salerno*, No. 86 Cr. 245 (S.D.N.Y.) (MJL).

organized crime have been given well-paying union jobs at the expense of the ILA and/or PPGU membership.

## INVESTIGATION AND PROSECUTION OF THE WATERFRONT GROUP'S RACKETEERING ACTIVITY

62.     In an effort to eradicate Waterfront corruption, the United States has prosecuted numerous cases against organized crime members and associates, including ILA officials.

### Prosecution of Michael Coppola, an Officer of the ILA and a Member and Associate of Organized Crime

63.     In 2012, Michael Coppola was convicted in the Eastern District of New York for conducting, and conspiring to conduct, the affairs of organized crime through a pattern of racketeering activity to control the Waterfront generally, and ILA Local 1235 in particular. *U.S. v. Coppola*, 671 F.3d 220 (2012).  The predicate racketeering acts of which he was convicted were: (1) conspiracy to extort, extortion, and wire fraud in connection with organized crime control of ILA Local 1235; and (2) conspiracy to possess with intent to use various false identification documents.  *Id.*  At trial, the government adduced extensive evidence of organized crime's control over the Waterfront generally and over Local 1235 in particular.  *Id.*  The evidence showed that organized crime would control which companies could do business on the Waterfront by, *inter alia*, providing "labor peace" in exchange for bribes or "tribute payments." *Id.*  There was also evidence presented at trial that organized crime exploited its control over Waterfront unions to make union employment decisions.  *Id.*  Coppola's conviction was affirmed on appeal. *U.S. v. Coppola*, 671 F.3d 220 (2012).

### Prosecution of Albert Cernadas, an Officer of the ILA and a Member and Associate of Organized Crime

64.     In 2010, Albert Cernadas ("Cernadas"), a former Executive Vice President of the

11

ILA, was charged with extortion and conspiracy in a long-running scheme to "shake down" ILA members as part of a "collection" for annual "Christmas tributes," *i.e.*, sums skimmed from the top of certain bonuses paid to ILA members at or around Christmas time.

65.     Upon information and belief, these Christmas tributes were earmarked for organized crime's members.

66.     The indictment reveals that Cernadas extracted the Christmas tributes through actual and threatened force, violence and fear, and that Cernadas was involved in the Christmas tribute scheme from 1982-2006.

67.     Upon information and belief, in 2006, Cernadas was forced to resign as Vice President of the ILA after pleading guilty in yet *another* racketeering action.

### Prosecution of Robert Ruiz, an Officer of the ILA and a Member and Associate of Organized Crime

68.     Upon information and belief, in December of 2010, a delegate at ILA-Local 1235, Robert Ruiz, was charged with collecting payoffs from ILA members in a similar fashion as the Christmas tributes.

69.     Upon information and belief, Ruiz was found with $51,900 buried in the backyard of a dockworker whom Ruiz had asked to hold the money until he could deliver it to members of organized crime.

### Prosecution and Conviction for Racketeering at the Waterfront Involving the ILA (Umberto Guido)

70.     On February 2, 1990, in *United States v. Guido, et al.*, No. 90 Cr. 60 (E.D.N.Y.) (ILG), Umberto Guido, the head of the Metropolitan Marine Maintenance Contractors Association ("METRO"), an ILA Local 1814 Trustee, and others were convicted of receiving

illegal payments from Local 1814's benefit funds in violation of 18 U.S.C. §1954 over a 20-year period.

71.    METRO is an association of employers engaged in, *inter alia*, Waterfront Commerce.

72.    Numerous members of METRO employ ILA members and METRO maintains established funds for the purpose of administering benefits to, *inter alia*, ILA members.

**Other Prosecutions for Racketeering at the Waterfront Involving the ILA**

73.    Historically, other cases involving criminal prosecutions along the Waterfront have included, *inter alia*:

- *United States v. Coffey, et al.*, No. 04 Cr. 651 (E.D.N.Y.) (ILG), in which Cernadas pleaded guilty to conspiracy to commit mail and wire fraud with respect to the illegal award of contracts by an associated ILA managed healthcare trust fund. Upon information and belief, Cernadas later entered into a Consent Decree providing for, *inter alia*, his resignation as an Executive Vice President of the ILA;

- *United States v. Bellomo*, No. 02 Cr. 140 (S-2) (E.D.N.Y.) (ILG), in which the United States obtained Waterfront racketeering convictions of the leadership of organized crime;

- *United States v. Gotti, et al.*, No. 02 Cr. 606 (E.D.N.Y.) (FB), in which the United States obtained Waterfront racketeering convictions of members of organized crime; and

- *United States v. Bellomo, et al.*, No 03 Civ. 1638 (E.D.N.Y) (ILG), in which the United States filed, and resolved by consent decree, civil allegations against organized crime members and associates in connection with Waterfront racketeering.

**Additional Indictments and Convictions for Racketeering Activity at the Waterfront**

74.    As set forth in a Civil RICO action filed by the United States Justice Department in 2006 ("U.S. Civil RICO Action"), the Complaint for which is annexed as Exh. 2, from 1977 to

1981, at least 129 individuals connected to the Waterfront Group were indicted, and 110 were convicted. Among those convicted were 52 union officials and several of the highest-ranking officials of ILA Locals 1814 and 1804-1, as well as the ILA. These Waterfront Group-related prosecutions include, *inter alia*:

a.   *United States v. Clemente*, No. 79 Cr. 142 (S.D.N.Y. 1980) (LBS), *aff'd*, 640 F.2d 1069 (2d Cir.), *cert. denied*, 454 U.S. 829 (1981), in which ILA International and Local officers Thomas Buzzanca, Vincent Colucci and Carol Gardner, and organized crime soldiers Tino Fiumara and Michael Coppola, were convicted of RICO and RICO conspiracy involving Waterfront Group extortions and unlawful labor payments. Also convicted in this case were Manuel and Joseph Castelo, owners and officers of Castelo and Sons Ship Servicing, Inc.; Gerald Swanton, Vice-President of Netumar International, Inc.; and Robert Meli and George Zappola, employees of M & R Repair Company;

b.   *United States v. Scotto*, No. 79 Cr. 32 (S.D.N.Y.) (CES), *aff'd*, 641 F.2d 47 (2d Cir. 1980), *cert. denied*, 452 U.S. 961 (1981), in which the ILA and Local 1814 officers Anthony Scotto and Anthony AnastAmericano were convicted of RICO and RICO conspiracy involving Waterfront Group-related extortion and receipt of unlawful labor payments;

c.   *United States v. Marino*, 639 F.2d 882 (2d Cir.), cert. denied, 454 U.S. 825 (1981), in which Vincent Marino, President of Marine Repair Services, Inc., was convicted of making unlawful labor payments to ILA official Anthony Scotto;

d.   *United States v. Cappell*, No. 78 Cr. 0842 (S.D.N.Y.), in which Mark O. Cappell, Vice-President of Prudential Lines, was convicted of conspiracy (18 U.S.C. §371) and tax violations (26 U.S.C. §7206);

e.   *United States v. Colletti*, No. 79 Cr. 0745 (S.D.N.Y.), in which Michael Colletti, Manager of Supply Operations, Ford Export Corp., was convicted of conspiracy (18 U.S.C. §371) and tax violations (26 U.S.C. §201);

f.   *United States v. Ecuadorian Line, Inc.*, No. 79 Cr. 0566 (S.D.N.Y.), in which the defendant shipping company was convicted of making unlawful labor payments to an ILA union officer (29 U.S.C. §186);

g.   *United States v. Field*, No. 79 Cr. 0538 (S.D.N.Y.), in which Fred Field, the ILA General Organizer and an officer of ILA Local 856, was convicted of six counts of wire fraud (18 U.S.C. §1343);

h.   *United States v. Gordon*, No. 79 Cr. 0706 (S.D.N.Y.), in which Sterling Gordon,

President and owner of Coffee Holding Company, Inc., was convicted of conspiracy and mail fraud (18 U.S.C. §§371 and 1341);

i.  *United States v. Haggerty*, No. 79 Cr. 0263 (S.D.N.Y.), in which Donald Haggerty, Operations Manager for Norton Lilly, was convicted of mail fraud (18 U.S.C. §1341);

j.  *United States v. Held*, No. 79 Cr. 0222 (S.D.N.Y.), in which Irving Held, an owner and officer of Sealand Terminal Corporation and several subsidiaries, and Carol Gardner, an ILA International and Local officer, were convicted of making and receiving illegal labor payments (29 U.S.C. §186), respectively;

k.  *United States v. Hopkins*, No. 79 Cr. 0256 (S.D.N.Y.), in which Robert Hopkins, Vice-President of Kerr Steamship Lines, was convicted of mail fraud (18 U.S.C. § 1341);

l.  *United States v. McGann*, No. 79 Cr. 0201 (S.D.N.Y.), in which Edward F. McGann, Vice-President of Grancolombiana Lines, Inc., was convicted of mail fraud (18 U.S.C. §1341);

m.  *United States v. McGrath Services Corp.*, No. 79 Cr. 0594 (S.D.N.Y.), in which the defendant stevedoring corporation was convicted of conspiracy (18 U.S.C. § 371) and making unlawful payments to an ILA union officer (29 U.S.C. §186);

n.  *United States v. Marano*, No. 80 Cr. 0149 (S.D.N.Y.), in which John R. Marano, an employer-owner of M & R Repair Company, was convicted of conspiracy and mail fraud (18 U.S.C. §§371 & 1341);

o.  *United States v. Martinelli*, No. 79 Cr. 0412 (S.D.N.Y.), in which Gian Marco Martinelli, an employee of Costa Lines, was convicted of mail fraud (18 U.S.C. § 1341);

q.  *United States v. O'Donnell*, No. 79 Cr. 0032 (S.D.N.Y.), in which William O'Donnell, an officer of Marine Repair Services, Inc., was charged with embezzlement from a common carrier (18 U.S.C. §660);

r.  *United States v. O'Hearn*, No. 79 Cr. 0030 (S.D.N.Y.), in which Walter O'Hearn, an officer of McGrath Services Corp., was convicted of making unlawful payments to an ILA union officer (29 U.S.C. §186);

s.  *United States v. Pierson*, No. 79 Cr. 0215 (S.D.N.Y.), in which Edward Pierson, an Assistant Vice-President of Moore McCormack, was convicted of mail fraud (18 U.S.C. §1341);

t.   *United States v. Pirrone*, No. 79 Cr. 0707 (S.D.N.Y.), in which Joseph Pirrone, an officer of Vaniman International, was convicted of mail fraud (18 U.S.C. §1341) and tax violations (26 U.S.C. §7201);

u.   *United States v. Quin Marine Services, Inc.*, No. 79 Cr. 0573 (S.D.N.Y.), in which Quin Marine Services, a stevedoring company that made unlawful labor payments to ILA union officers, was convicted of conspiracy and mail fraud (18 U.S.C. §§ 371 and 1341);

v.   *United States v. Rosen*, No. 79 Cr. 0650 (S.D.N.Y.), in which David Rosen, an officer of McGrath Services, Inc., was convicted of conspiracy (18 U.S.C. § 371) and making unlawful labor payments to an ILA union officer (29 U.S.C. §186);

w.   *United States v. Seregos*, No. 79 Cr. 0564 (S.D.N.Y.), *aff'd*, 655 F.2d 33 (2d Cir. 1981), *cert. denied*, 455 U.S. 940 (1982), in which Nicholas Seregos, an officer of Jackson Engineering, was convicted of mail fraud and wire fraud (18 U.S.C. §§ 1341 and 1343);

x.   *United States v. Spitz*, No. 80 Cr. 0004 (S.D.N.Y.), in which Arnold Spitz, a consultant for Gydnia Lines, was convicted of mail fraud (18 U.S.C. § 1341) and tax violations (26 U.S.C. §7201);

y.   *United States v. Traficante*, No. 78 Cr. 0840 (S.D.N.Y.), in which C. Thomas Traficante, an officer of Gydnia Lines, was convicted of mail fraud (18 U.S.C. §1341); and

z.   *United States v. Weeks*, No. 79 Cr. 0333 (S.D.N.Y.), in which Richard N. Weeks, President of Weeks Stevedoring, was convicted of mail fraud and conspiracy (18 U.S.C. §§1341 and 371).

### *Congressional Investigations of Racketeering at the Waterfront*

75.   Despite these many successful criminal prosecutions (known as "UNIRAC" for union racketeering), organized crime continues to dominate the Waterfront and control those who seek to benefit financially from illegal participation in racketeering activity in Waterfront Commerce. The U.S. Senate's Permanent Subcommittee on Investigations concluded in a 1984 report:

> UNIRAC, for all its successes, did not rid the waterfronts of all crime or all criminals. Corrupt practices, according to some witnesses before the

Subcommittee, already had begun to return to the Atlantic and Gulf Coast docks. What is needed, then, is continued scrutiny of the maritime industry by government agencies.

Waterfront Corruption: *Report of the Permanent Subcommittee on Investigations* at 9 (March 27, 1984).

76.     The President's Commission on Organized Crime ("PPOC") in a 1986 Report:

Historically, the International Longshoremen's Association (ILA) has been virtually a synonym for organized crime in the labor movement . . . .

PCOC, *Report to the President and the Attorney General.*

THE EDGE: Organized Crime, Business and Labor Unions at 33 (March 1986). The PCOC concluded in pertinent part that organized crime:

exercises almost unfettered control...over the New York-New Jersey Waterfront

and specifically found that:

Locals 1814 and 1804-1 remain firmly under the control of [organized crime] Families ...

*Id.* at 39

77.     In the 1988 hearings before the Senate's Permanent Subcommittee on Investigations, several former "made" members of America's most notorious organized crime families confirmed that organized crime continues to exercise control over the ILA and the Waterfront.

**The Justice Department Commences a Civil RICO Action Arising**
**from Racketeering Activity at the Waterfront Involving the ILA**

78.     On or about February 14, 1990, the United States, pursuant to the civil provisions of the RICO Act, commenced an action in the United States District Court for the Southern District of New York delineating broad-ranging and pervasive organized crime influence and

17

control over ILA Locals 824, 1588, 1804-1, 1809, 1814 and 1588. *United States v. Local 1804, International Longshoremen's Association, et al.*, No. 90 Civ. 0963 (S.D.N.Y.) (LBS) (the "ILA Local Civil RICO Case"). A copy of the Amended Complaint in the ILA Local Civil RICO Case is annexed as Exhibit 4.

79.     Each of the defendant ILA Locals in the ILA Local Civil RICO Case ultimately entered into a consent decree, resolving the action.[3]

80.     On or about March 25, 1991, by Consent Judgment in the ILA Local Civil RICO Case (Exh. 3), Local 1804-1 consented to the appointment by the United States District Court for the Southern District of New York of a Monitor with authority to oversee a number of the Locals' Waterfront operations.

81.     The Consent Judgment also provided that the Local 1804-1 Executive Board, and all current and future officers, agents, representatives, employees and members of Local 1804-1, were to be permanently enjoined:

(a)     from committing any acts of racketeering activity, as defined in 18 U.S.C. § 1961 *et seq.*, or knowingly associating with any member or associate of any Organized Crime family...or any other criminal group or any person prohibited from participating in union affairs; and

(b)     from obstructing, opposing, or otherwise interfering with the work of the court-appointed officers described herein...

82.     The March 25, 1991 Consent Judgment in the ILA Local Civil RICO Case was signed by, *inter alia*, Defendant Daggett, on his own behalf and on behalf of Local 1804-1 as its then-Secretary-Treasurer.

83.     Upon information and belief, Defendant Daggett has violated and continues to

---

[3]Case 1:05-cv-03212-ILG-VVP Document 49 Filed 02/21/06 Page 30 of 85 PageID #: 653.

violate the March 25, 1991 Consent Judgment by, *inter alia*, associating with members and associates of organized crime.

84.     On or about March 26, 1991, Locals 824, 1809 and 1909 entered into their own Consent Judgment with the United States in the ILA Local Civil RICO Case ("March 26, 1991 Consent Judgment") (Exh. 5).

85.     Pursuant to the March 26, 1991 Consent Judgment, Locals 824, 1809 and 1909 agreed to supervision of upcoming elections by the United States Department of Labor. In addition, Local 1909 agreed to imposition of a court-appointed Employment Practices Monitor.

86.     The March 26, 1991 Consent Judgment further provided: that persons holding office in Local 824, Local 1809, and Local 1909 shall not in the future knowingly associate with any member or associate of any organized crime family or any other criminal group or any person prohibited from participating in union affairs, except that they may associate with any person in connection with their lawful duties and responsibilities as union officers. John Bowers, then-President of the ILA, signed this Consent Judgment on his own behalf and as President of ILA Locals 824, 1809 and 1909. Robert Gleason, then-Secretary-Treasurer of the ILA, signed the March 26, 1991 Consent Judgment on his own behalf and as Secretary-Treasurer of ILA Local 1809.

87.     On or about December 17, 1991, by Consent Decree in the ILA Local Civil RICO Case (Exh. 4), Local 1814 agreed to the imposition of a court-appointed Monitor and a permanent injunction against racketeering activity and any further association with organized crime.

88.     On or about January 3, 1992, ILA Local 1588 entered into a Consent Order in the ILA Local Civil RICO Case by which ILA Local 1588 acknowledged that there had been

"allegations, sworn testimony, and criminal convictions reflecting past problems with organized crime corruption of [ILA] Local 1588" and agreed to a permanent injunction against racketeering activity and association with organized crime. The Consent Order established and put in place an Ombudsman with authority to enforce Local 1588's constitution and by-laws, as well as the terms of the Consent Order. The Consent Order additionally provided for the supervision by the Department of Labor of upcoming ILA Local elections.

89.   In addition to John Bowers, Robert Gleason, and Defendant Daggett, upon information and belief, nearly all other individual defendants in the ILA Local Civil RICO Case entered into settlements with the United States, in some instances as ILA officers as well as on behalf of themselves individually, including, *inter alia*:

(1)   George Barone, a member of organized crime, a former International ILA Vice-President, Organizer of the ILA Atlantic Coast District Council, Business Agent for ILA Local 1804-1, and President of Miami, Florida Local 1922. *United States v. Barone, et al.*, 78 Cr. 185 (S.D. Fl.) (WMH), *aff'd sub nom.* In *United States v. Kopituk*, 690 F.2d 1289 (11th Cir. 1982); *cert. denied*, 463 U.S. 1209 (1983), Barone was convicted of conducting and conspiring to participate in the conduct of an enterprise through a pattern of labor racketeering (RICO, 18 U.S.C. § 1962(c)), RICO conspiracy (18 U.S.C.§ 1962(d)), extortion (18 U.S.C. § 1951), receiving unlawful labor payments (29 U.S.C. § 186(b)), and tax evasion. Barone also had been convicted previously of felonious assault. Additionally, Barone and another member of organized crime, Douglas Rago, were expelled from Canada by the Canadian Government for their perpetration of a scheme to defraud.

(2)   James Cashin, another member of organized crime and the former Secretary-Treasurer of ILA Local 1804-1, who had succeeded his father, Harry Cashin, in that position in approximately 1962.  Cashin was convicted in June 1978 for assault with intent to kill.

(3)   Thomas Buzzanca, another member of organized crime and the former President of ILA Local 1804-1. In *United States v. Clemente, et al.*, 79 Cr. 142 (S.D.N.Y.) (LBS), *aff'd*, 640 F.2d 1069 (2d Cir.), *cert. denied*, 454 U.S. 829 (1981), Buzzanca was convicted, *inter alia*, of conducting and conspiring to participate in the conduct of an enterprise through a pattern of labor racketeering activity, (RICO 18 U.S.C. §1962(c)), RICO conspiracy (18 U.S.C. §1962(d)), extortion

(18 U.S.C. §1951), receiving unlawful labor payments (29 U.S.C. §186(b)), and tax evasion.

(4)     Frank Lonardo, a cousin of former underboss of a Cleveland organized crime family. Lonardo replaced his cousin Anthony Scotto in 1979 as the President of ILA Local 1814 and became General Organizer of the ILA and a MILA Trustee (MILA refers to the ILA members' health care funds).

(5)     Anthony Pimpinella, another member of organized crime, Executive Vice-President of ILA Local 1814, the General Organizer of the International, Vice-President of the ILA Atlantic Coast District Council, and trustee of ILA-NYSA employee benefit funds.

(6)     Alfred Small, a Vice President of ILA Local 1814 and an Organizer for the International.

(7)     Joseph Colozza, Vice President of ILA Local 1814, an Organizer for the International, Vice-President of the ILA Atlantic Coast District Council, and trustee of several NYSA-ILA employee benefit funds.

(8)     Santo Calabrese, an Executive Board member of ILA Local 1814.

(9)     Ralph Perello, an Executive Board member of ILA Local 1814.

(10)    Richard Pierce, an Executive Board member of ILA Local 1814.

(11)    Gregory Lagana, Delegate of ILA Local 1814. On February 6, 1990, Lagana pled guilty in *People v. Lagana*, Cr. No. 1272/90 (N.Y. Sup. Ct. Kings Co.), to the crime of bribe receiving by a labor official in violation of N.Y. Penal Law § 180.05. Lagana had been accused of accepting a bribe in exchange for promising Waterfront employment.

(12)    Anthony Ciccone, another member of organized crime, former Vice President of the ILA Atlantic Coast District, and Special Administrator of ILA Local 1814.

(13)    Louis Pernice, Secretary-Treasurer of ILA Local 1814.

(14)    C.F. Kenny, a Vice President on the ILA Executive Council, President of ILA Local 1804-1 and an Organizer of the ILA Atlantic Coast District Council.

(15)    Harry Cashin, Vice-President of ILA Local 1804-1.

(16)    Ronald Capri, Recording Secretary of ILA Local 1804-1.

21

*The Southern District Finds that the Waterfront Group Constitutes an*
*Enterprise within the Meaning of the RICO Statute*

90.     While each of the ILA Locals and a number of the individual defendants

eventually entered into settlements in the ILA Local Civil RICO Case, several individual

defendants therein opted to contest the allegations and proceed to trial ("ILA Local Civil RICO

Trial").

91.     At the conclusion of the ILA Local Civil RICO Trial, this Court ruled that the

United States proved that labor unions, union officials, businessmen, and organized crime

families in the Port and Waterfront constitute an "enterprise" within the meaning of the RICO

statute and that the defendants therein who had not settled had conducted or participated in the

conduct of the affairs of the Waterfront through a pattern of racketeering activity. *See United*

*States v. Local,* at 1804-1 *Int'l Longshoremen's Ass'n,* 812 F. Supp. 1303, 1344 (S.D.N.Y. 1993)

(LBS) ("ILA RICO Decision").

*More Prosecutions of ILA Associates for Involvement in Organized Crime*

92.     In March 2002, Nicholas Furina, an organized crime associate, and many officials

of ILA Local 1588, were arrested on charges of Waterfront racketeering and extortion.

93.     In or about January 2002, many members of organized crime families in New

York were indicted in the Eastern District of New York on multiple counts of Waterfront

racketeering in *United States v. Bellomo, et al.,* No. 02 Cr. 140 (S-2) (E.D.N.Y.) (ILG). On April

7, 2003, each of the defendants therein pled guilty to one or more counts.

94.     On or about June 3, 2002, additional members of organized crime in the United

States were indicted in the Eastern District of New York on multiple counts of Waterfront

racketeering in *United States v. Gotti, et al.,* No. 02 Cr. 606 (E.D.N.Y.) (FB). On March 17,

2003, the aforesaid persons were found guilty of the charges.

95.     By Opinion and Order, dated January 29, 2003, the Honorable John A. Martin, United States District Judge for the Southern District of New York, ruled that Local 1588 had violated the terms of its January 3, 1992 Consent Order in the ILA Local Civil RICO Case and ordered that an Administrator be appointed "[w]ith broad powers to direct the operations of the union and to supervise the election of new officers . . . ." *United States v. Local 1804-1, Int'l Longshoremen's Ass'n*, 2003 WL 194584, *4 (S.D.N.Y.).

96.     In its decision, the Court found that the ILA and, in particular, then-ILA President John Bowers, had failed to take action when confronted with organized crime activity at ILA Local 1588. *Id.* at *3-4. The ILA opposed the appointment of the Administrator, arguing that it had in fact taken steps to address the rampant criminal conduct at ILA Local 1588 by appointing an ILA official as trustee of ILA 1588 Local in December 2002.  In rejecting this contention, the Court remarked:

> While willingness of an International to take effective action to deal with the problems in a Local might in some circumstances persuade the Court that there is no need for court intervention to protect the rights of union members, the actions of the International with respect to Local 1588 are less than impressive. A clear insight into the problem of entrusting the protection of the Local to the care of the International is found in the June 27 letter of President Bowers appointing the committee to investigate Local 1588.

*Id.*, at *1 (the letter of then-ILA President Bowers is referred to as the "Bowers Letter"). As reflected in the Southern District's Opinion, the Bowers Letter begins: "As you are aware, two local presidents of Local 1588 have recently been indicted on charges involving the rights of Local 1588 members." *Id.*, at *3.  The Court further noted that,

> One of the "recently" indicted presidents was John Angelone, who had been arrested on racketeering charges more than three years before the committee was appointed and who had pleaded guilty to the charges on which he was indicted

more than 2 ½ years before President Bowers gave any thought to trying to protect the rights of the members of Local 1588. More significant than President Bowers' failure to appoint a committee to investigate Local 1588 for more than 2 ½ years after its entire leadership was indicted and convicted on labor racketeering charges, is the fact that no one from the International ever questioned Angelone about this illegal activity from the time the charges became public in May of 1999 until he resigned as President of Local 1588 in January, 2002. Nor was any attempt made by the International to remove Angelone as President of the Local from the time of his plea until after the Waterfront Commission issued a "Section 8 Letter" advising him that, as a result of his conviction and sentence, he was required to resign as President. Indeed, in a conversation tape-recorded by law enforcement officials, Angelone was overheard saying that Thomas Gleason, counsel to the International, had told him not to resign "until the Section 8 Letter."

*Id.*

97.     In so finding, the Court also noted that just three weeks before then-President of the ILA Bowers called for the appointment of the internal committee to investigate Local 1588, an article appeared in *The New York Times* reporting that: "prosecutors were considering instituting a lawsuit to take control of the ILA because it was under the control of the Gambino and Genovese crime Families." *Id.*, at *2.

98.     Upon information and belief, the ILA's failure to remove Local 1588's corrupt union leaders was in accord with its longstanding practice of permitting organized crime members to infiltrate and maintain high-ranking positions within the ILA hierarchy. As set forth by the Senate Permanent Subcommittee on Investigation in its report on Waterfront Corruption ("Waterfront Corruption Report"):

> In none of the UNIRAC convictions of ILA officers did [then-ILA president] Teddy Gleason direct that a union official found guilty of labor racketeering be removed from office or from a position of fiduciary trust.
>
> Several convicted ILA officials whose appeals had been exhausted or who went to jail upon conviction - Anthony Scotto, Fred R. Field, Jr., Anthony Anasti (sic), Thomas Buzzanca, Vincent Colucci, Carol Gardner - had been removed from office. But in none of these instances did Gleason initiate the removal.

Waterfront Corruption Report at 87-88.

99.     The Waterfront Corruption Report recounts the following exchange during

Gleason's testimony before the Senate's Permanent Subcommittee on Investigations:

> Senator NUNN: Do you think these people have been rehabilitated, they have just
> been convicted again for all sorts of crimes under the UNIRAC investigation? Are
> you saying ILA is running a rehabilitation program for convicted felons?
> Rehabilitate them to put them in high international office?
>
> GLEASON: Maybe we will have to, Senator.
>
> Senator NUNN: Have to?
>
> GLEASON: Maybe we will have to.
>
> Senator NUNN: Have to what?
>
> GLEASON. Run a rehabilitation center like you said.

*Id.*

### The ILA Continues to Select the Same Leaders Notwithstanding
### Their Involvement in Organized Crime

100.    At its Convention held in July 21, 2003, Defendant Daggett, Bowers, Gleason,

Cernadas, and Coffey were all re-elected to their positions despite evidence that they are

members of and/or associated with organized crime, and engaged in racketeering activity.

Although the ILA adopted an alleged "Code of Ethics" and established an office of "Ethical

Practices Counsel" after the convictions in *Gotti* and *Bellomo*, upon information and belief, these

measures have brought no actual reform to the Waterfront Group.  Many high-ranking ILA

officials implicated in wrongdoing in the *Gotti* and *Bellomo* cases, in which convictions for

Waterfront racketeering were obtained, have remained in their positions with impunity or have

been elevated.

101.    The ILA's response to the *Coffey* prosecution resolves any doubt as to the need

for the relief sought in this action. Though the ILA maintains a website, publishes a newsletter and issues press releases regularly, the ILA made no mention of the fact that Cernadas, its former Executive Vice-President, pled guilty to mail and wire fraud conspiracy concerning an award of important welfare benefit contracts. Upon information and belief, the ILA chose to ignore this fact, although it congratulated then-Assistant General Organizer, Defendant Daggett and former Vice-President Coffey upon their acquittals, stating: "Today is a wonderful day for our ILA ... [Defendant] Daggett and Arthur Coffey have served this ILA with distinction." Not surprisingly, the ILA press release made no reference to Defendant Daggett's trial testimony in which he proclaimed that convicted Waterfront racketeer Andrew Gigante was "a damn good man" and that, in 38 years in the ILA, he had never heard of organized crime involvement at the Ports.

102.   After 50 years of documented corruption, it is clear that only broad-reaching, Court-imposed relief can remediate the effects of organized crime's involvement with the Waterfront Group and restore American to the financial position it maintained prior to falling victim to the racketeering scheme implemented by the Waterfront Group to illegally oust American as the MTO from the Terminals and cause American to suffer severe financial and economic harm ("Scheme").

**THE ENTERPRISE**

103.   Defendants have created an enterprise within the meaning of the RICO statute, comprised of, among others, the individual members of the unions involved in Waterfront Commerce, including the ILA, the executive members of the ILA, the individual members of the ILA local unions ("Locals") and other ILA subordinate labor organizations, the trustees of the NI Fund, the PPGU, the executive members of the PPGU, the individual members of PPGU Locals and other PPGU subordinate labor organizations, the trustees of the NP Fund and the individual

26

Defendants identified herein (the "Enterprise").

104.   Upon information and belief, the Enterprise is ongoing and has engaged in widespread and pervasive racketeering activity, to be further detailed hereinafter.

105.   The Enterprise is engaged in, and its activities regularly affect, interstate and foreign commerce.

106.   The "Captain" of the Enterprise is Defendant Daggett.  As President of the ILA, Executive Trustee of the NI Fund (and by exercise of his control over the PPGU and the NP Fund), Defendant Daggett has orchestrated, participated in, and/or authorized a series of criminal "predicate acts" described herein, each aimed at fulfilling the purpose of the Enterprise and perpetuating the Scheme.

107.   Upon information and belief, Defendant Daggett works in concert with the other Defendants involved in the Scheme.

108.   Defendants' creation of the Enterprise and implementation of the Scheme has had a broad and far-reaching impact, not only upon American, but upon the consuming public in New York and the rest of the Nation, in the form of, among other things, increased costs of goods and services and lost jobs.

## DEFENDANTS' PATTERN OF RACKETEERING ACTIVITY SPECIFICALLY DIRECTED AT AMERICAN

109.   During the period of time that American operated the Ports (in or about 1993 to September 26, 2011) until American was ejected as a result of the Scheme, American's business operations were regularly hampered and constrained by Defendants' illegal activities.

110.   Upon information and belief, Defendants desired and expected that American would be willing to participate in the Waterfront Group's illegal and corrupt activities. When it

did not, members of the Waterfront Group resorted to pressure by *inter alia*, threats of violence, labor strife and other commercial interference with American's shipping customer agreements.

111.    Despite the pressure exerted by Defendants over the years, American steadfastly refused to participate in or acquiesce to any corrupt or illegal activities perpetrated by members of the Waterfront Group.

112.    American's refusal to participate in or acquiesce to the corrupt and illegal activities led the members of the Waterfront Group to implement the Scheme – specifically, to render it impossible for American to run a profitable business or survive as an MTO at the Port and to oust American from its position as MTO of the Ports, causing American to suffer economically and financially.

113.    In or about March 2005, Defendant Daggett began to openly express his desire for American to cease operations in Waterfront Commerce.   Defendant Daggett told American's President, Sabato Catucci ("Sabato"), that he wanted to see Sabato thrown out of the port sector, as he regarded Sabato to be a "troublemaker" who "did not know how to give the ILA what it wanted."

114.    Sabato is a self-made businessman, beginning as a driver, serving honorably in World War II, and ultimately working his way up to becoming the Chairman and President of American.

115.    Over the next six years, Defendant Daggett, in concert with the other Defendants

in this action, worked tirelessly to oppress American economically and financially, in an effort to cause American harm and oust it from the Port.[4]

**A.    *Defendants Extort American's Immediate Ejectment from the Port***

116.    In or about August 2011, with American on its knees as a result of Defendants' perpetration of various elements of the Scheme, Defendant Daggett began to apply pressure on American to sign an agreement with the Port Authority ("Succession Agreement"), by which American would be ejected from the Terminals, with control to be taken over by Red Hook Container Terminal, LLC ("RHCT, LLC"), a company favored by the Waterfront Group over American.

117.    Upon information and belief, RHCT, LLC was favored by the Waterfront Group over American because, upon information and belief, it was willing to permit the Waterfront Group to engage in illegal and corrupt activities.

118.    In August 2011, Defendants Pernice and Farrino threatened Sabato by telling him, among other things, that, if American were to refuse to sign the Succession Agreement (and accept ejectment from the Ports), he (Sabato) would be taken out of the Terminals "in a box."

119.    Upon information and belief, Pernice and Farrino made the aforementioned and described threats at the behest of Defendant Daggett and/or Defendant Daggett's associates who are affiliated with organized crime.

120.    On September 22, 2011, American was informed that ILA members were planning a strike to begin the following day unless American immediately signed the Succession Agreement.

---

[4] The allegations which follow are not intended to appear chronologically.

121.   On September 22, 2011, American was informed that PPGU members were also planning to strike beginning the following day, unless American immediately signed the Succession Agreement which had been contemporaneously presented by the Port Authority.

122.   Upon information and belief, Defendant Daggett was the individual who caused and/or directed the ILA and PPGU to threaten the strike.

123.   Upon information and belief, Defendant Daggett's purpose in arranging the threatened strike was to coerce American into immediately signing the Succession Agreement.

124.   As of the following day, September 23, 2011, American had not signed the Succession Agreement.

125.   On September 23, 2011, both the PPGU and ILA instituted a Port-wide strike, against American, thereby removing from the Terminals all labor necessary to operate the Port and effectively shutting down American's business ("Port-Wide Strike").

126.   During the days immediately before, during and after the Port-Wide Strike, officers and employees of American, including, among others, Keith Catucci and Matthew Yates ("Yates"), had telephone conferences with the ILA, including with Defendant Daggett and/or his son, Dennis Daggett.  During one of these calls, American was told that the Port-Wide Strike would continue unless American submitted to the coercion and immediately signed the Succession Agreement.

127.   One or more of the Defendants repeated to the Port Authority Defendant Daggett's threat to continue the Port-Wide Strike until American signed the Succession Agreement (effectively shutting down American's business).

128.   The Port Authority confirmed and conveyed to American in writing Defendant

Daggett's threat of a continued Port-Wide Strike unless American immediately signed the Succession Agreement.

129.    At the time of the threats by and/or on behalf of Defendant Daggett and other Defendants of a Port-Wide Strike, the relationships between American and ILA and PPGU were governed by CBAs.

130.    The Port-Wide Strike was threatened and effectuated in violation of the CBAs and federal law.

131.    On September 26, 2011, American, faced with the illegal Port-Wide Strike that threatened to render American insolvent, signed the Succession Agreement (which Daggett precipitated) and the next day (September 27th), RHCT, LLC took over American's operations at the Terminals.

132.    As a result of the foregoing, American lost its MTO business.

**B.**     *Extortion in Connection with American's Demurrage Claim*

133.    The Shipping Act requires MTOs to file with the Federal Maritime Commission, a tariff ("Shipping Tariff") whenever a container is removed from a vessel and brought to a terminal.

134.    When a container is removed from a vessel and brought to a terminal, the charteree may incur a fee during any "Demurrage," which refers to the period of time that the charteree remains in possession of a container or vessel after the period of time normally allowed to unload cargo from the vessels ("Laytime").

135.    Demurrage also refers to a form of liquidated damages based upon the cost of the Shipping Tariff for breach of the Laytime set forth in the contract between the chartering companies.

136.   In or about late August-early September 2011, Phoenix Beverage Co. ("Phoenix") owned and operated by Gregory and Rodney Brayman (father and son, respectively) (the "Braymans") had 95 containers delivered to the Terminals ("Phoenix's Containers").[5]

137.   Upon information and belief, MTC Trucking, of which Defendant Farrino is a principal, is a "house trucker" for Phoenix and fulfills all of Phoenix's trucking needs, including but not limited to, picking up containers from the Terminals.

138.   Upon delivery of Phoenix's Containers to the Terminals and in the weeks thereafter, the Braymans did not arrange for MTC Trucking (or any other trucking company) to retrieve the Containers, nor did they pay American the Demurrage.

139.   The failure to arrange for pickup of Phoenix's Containers from the Terminals resulted in a $241,506,00 Demurrage owed to American by Phoenix.

140.   Under federal law, American, by virtue of its Demurrage claim, had the right to impose a lien on the Phoenix Containers and prevent their release unless and until the Demurrage was paid in full.

141.   During the same conversations and exchanges between American and Defendant Daggett with regard to the Succession Agreement (¶¶126-127 above), Daggett told American that, unless American immediately also dropped its Demurrage claim and lien against Phoenix, American would continue to be subjected to the Port-Wide Strike and other labor strife.

142.   Defendant Farrino similarly told Yates that American was "finished in this town," that Defendant Farrino's "buddies are going to take care of you [Yates]," and that American was going to "get fucked" if American did not immediately drop its claim for the Demurrage.

---

5 The Braymans are also owners of RHCT, LLC, the company that succeeded American at the Terminals following execution of the Succession Agreement.

143.    Facing the imminent Port-Wide Strike in connection with the execution of the Succession Agreement and further labor strife as threatened by Defendants Daggett and Farrino in connection with the Demurrage, American submitted to the coercion and released the Phoenix Containers, thereby resulting in a $241,506.00 loss to American.

## C.    Extortion and Mail Fraud in Connection with Alleged Withdrawal Liability Against American

144.    At all relevant times herein, American, under its CBA with the PPGU, paid assessments, a portion of which was transmitted to the PPGU for pension benefit contributions to the Defendant NP Fund.

145.    At all relevant times herein, American, under its CBA with the ILA, paid assessments, a portion of which was transmitted to the ILA for pension benefit contributions to the Defendant NI Fund.[6]

146.    ERISA establishes a continuing obligation on a "withdrawing employer" (as that term is defined under ERISA) to pay certain interim periodic withdrawal liability payments, in accordance with a payment schedule set forth by the plan sponsor.  Should an employer not make the withdrawal liability payments, and if such failure is not cured within 60 days after the date of receipt of a notice of default, the entire amount of withdrawal liability may become due unless the employer has defenses thereto.

147.    ERISA provides a mechanism by which an employer may request a review of a plan sponsor's determination of its alleged withdrawal liability no later than 90 days after the employer receives the notice of the amount of its withdrawal liability together with a schedule of

---

[6] Upon information and belief, assessments paid by American were diverted by one or more of the defendants towards ILA plans and funds other than the NI Fund, and such funds have been the subject of indictments relating to racketeering activity along the Waterfront.

liability payments and demand for payment ("Notice Period").

148.    ERISA also provides for statutory arbitration to permit employers to challenge claims for withdrawal liability ("Statutory Arbitration Provisions").

149.    On or about April 2, 2012, the NI Fund, through its trustees, including Defendants Curto, Daggett, Knott, and Pernice, filed an action against American in the United States District Court for the Southern District of New York, Civil Action No. 1:12-cv-02506-PAC, alleging that American had withdrawn within the meaning of ERISA, and demanded alleged withdrawal liability under ERISA, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA), 29 U.S.C. §§1001-1461 (the "SDNY Action").

150.    On or about April 18, 2012, the NP Fund, through its trustees, including Defendants Oates and Punturieri, and, upon information and belief, at the direction of Defendants Curto and Daggett, filed an action against American in the United States District Court for the District of New Jersey, Civil Action No. 2:12-cv-02309-ES-CLW, also to recover alleged withdrawal liability under the MPPAA (the "New Jersey Action").

151.    The same law firm represents the NI Fund and the NP Fund in the respective SDNY and New Jersey Actions.

152.    Upon information and belief, the SDNY Action, New Jersey Action and the predicates therefor (set forth below), were coordinated by Defendants Daggett and/or Curto and/or others acting in concert with them, in furtherance of the Scheme to selectively enforce provisions of the MPPAA against American to destroy American economically and financially.[7]

---

7 At the same time that the NI Fund and the NP Fund filed actions against American to foreclose on alleged withdrawal liability, the ILA and various of its associated Funds, other than the NI Fund, including the NYSA-ILA Fringe Benefits Escrow Fund, the NYSA-ILA Container Royalty Fund, and the NYSA-ILA Money Purchase Pension Fund and Plan, together with their respective trustees, filed yet *another* action against American, this one in

153.    Upon information and belief, several other MTO-employers that have or had CBAs with the ILA and/or the PPGU, including, *inter alia*, Orient Overseas Container Line, Carmine Ragucci, Peninsular and Oriental Steam Navigation Company, Dubai Ports World, Ports America, Mediterranean Shipping Company, and Maher Shipping (collectively, "Other Employers"), withdrew from the NI Fund and/or the NP Fund in a manner that could or should have triggered liability under the MPPAA. Yet, upon information and belief, neither the ILA nor the PPGU attempted to enforce the MPPAA or seek alleged withdrawal liability against the Other Employers.

154.    By the SDNY Action and the New Jersey Action, the plaintiffs therein threatened to impose liability against American in amounts in excess of $1 Million.

155.    The alleged predicates for both the SDNY Action and the New Jersey Action were notices alleged to have been sent to American on or about October 26, 2011 and January 18, 2012 ("Alleged Notices").

156.    The Alleged Notices were purportedly sent to the Newark Terminal, located at 138 Marsh Street in Newark, New Jersey (the "Marsh Street Address"), from which American had been ejected on September 26, 2011 -- a month prior to the first Alleged Notice and four months prior to the second Alleged Notice.

157.    RHCT, LLC took over American's Port operations at its Terminals on September 27, 2011, including American's operations at the Marsh Street Address.

158.    The NI Fund and the ILA were well aware that American was not located at the

the United States District Court for the Eastern District of New York (the "Eastern District Action"), seeking *inter alia*, to enforce an arbitration award issued in connection with the CBA between American and the ILA and to recover allegedly delinquent employee-benefit-fund contributions under ERISA which, according to the ILA, violated the governing CBA. The plaintiffs in the Eastern District Action claimed that American's alleged breaches of the CBA resulted in approximately $160,000.00 in damages.

Marsh Street Address at the time the Alleged Notices were purportedly sent there.

159.   Upon information and belief, the NP Fund and the PPGU were well aware that American was not located at the Marsh Street Address at the time the Alleged Notices were purportedly sent there.

160.   Upon information and belief, Defendant Daggett, Defendant Curto, and other participants in the Scheme fully knew, at the time the Alleged Notices were sent to the Marsh Street Address, that American was operating its business from another location and that RHCT, LLC was operating from the Marsh Street Address.

161.   Defendants Daggett and Curto, the ILA, and the NI Fund, in collusion with the PPGU and the NP Fund, utilized interstate mail in a manner calculated to prevent American from receiving the Alleged Notices.

162.   Upon information and belief, Defendants Daggett and/or Curto hoped to trigger the liability provisions under the MPPAA to preclude American from interposing a defense to the amount of alleged withdrawal liability in the SDNY and New Jersey Actions and from timely invoking the Statutory Arbitration Provisions.

163.   An employee of RHCT, LLC, Eric Seal, purported to acknowledge receipt of the Alleged Notices at the Marsh Street Address on American's supposed behalf and returned, through the United States Mail, an acknowledgment to the ILA.

164.   Despite Defendants' knowledge that RHCT, LLC had succeeded American at the Terminals, that RHCT, LLC and American operate as two distinct and unrelated entities, and that Mr. Seal is not authorized to accept mail on American's behalf, Defendant Daggett accepted the acknowledgment of receipt executed by Mr. Seal, and treated it as if such had been acknowledged by American.

36

*Wire Fraud by the ILA, PPGU, NI Fund and NP Fund*

165.    The NI Fund and the NP Fund pled in their Complaints and falsely represented to the Courts that American received the aforesaid Alleged Notices even though the NI Fund fully knew and, upon information and belief, the NP Fund fully knew that such Notices had not been sent to American's proper address and thus had not been received by American.

166.    The NI Fund filed its Complaint in the SDNY Action by use of the Internet, which required the use of interstate wire services.

167.    The NP Fund filed its Complaint in the New Jersey Action by use of the Internet, which required the use of interstate wire services.

168.    American has defended the SDNY Action by arguing, *inter alia*, that the NI Fund failed to give American sufficient notice under ERISA and instituted the SDNY Action in bad faith and/or with unclean hands.

169.    During documentary discovery in the SDNY Action, the NI Fund produced documentation confirming that the NI Fund (and the ILA) had American's proper address but chose not to send the aforesaid notice thereto.

170.    During deposition discovery in the SDNY Action, witnesses testifying on behalf of the ILA and/or NI Fund have admitted that it was common knowledge at the ILA and NI Fund, prior to issuance of the Alleged Notices, that American had vacated the Marsh Street Address to which the Alleged Notices were sent.[8]

---

[8]The PPGU and NP Fund have not yet completed discovery or even submitted to depositions in the New Jersey Action. Accordingly, American has not yet uncovered in the New Jersey Action, the clear evidence of fraud that is present in the SDNY Action.

**D.     Fraud, Mail Fraud, and Labor Racketeering by the ILA
in Connection with its Submission of False Injury
Claims:**

171.    Longshoremen at the Terminals are covered under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §901.

172.    Workers compensation insurance for those employees covered under this statute is considerably higher relative to coverage provided under state workers' compensation laws.

173.    As the former employer of the insured longshoremen, American paid insurance premiums ("Premiums") under the Longshore and Harbor Workers' Compensation Act.

174.    The cost of Premiums was increased due to proliferation of fraudulent claims and insurance fraud perpetrated by members of the Enterprise in furtherance of the Scheme.

175.    Upon information and belief, ILA officials, specifically Defendants Pernice and Pollio, among others, encouraged ILA members to meet with a designated attorney, who would assist them to stage bogus accidents and complain of false injuries in order to make fraudulent claims against American for workers compensation insurance.

176.    American repeatedly insisted that its compensation and disability insurance carrier, Signal Administration, Inc., investigate and dispute all suspicious and/or false claims.

177.    When Sabato complained of the ILA members' misconduct to the executive members of the ILA and questioned the manner by which the allegedly injured longshoremen were all represented by the same attorney, he was "laughed at," and told by Defendants Pernice and Pollio, "Yes, well what do you want us to do?  It's just a coincidence [that scores of workers were represented by the same attorney].  Leave [the attorney] alone -- he is a buddy of ours."[9]

---

[9] As reflected in *United States v. Gotti*, No. 02 Cr. 606, in 2003, then President of the ILA, Anthony Ciccone, was convicted of committing racketeering acts of conspiracy to extort as well as extortion with respect to a false injury

178.    American understood the aforesaid statement by Defendants Pernice and Pollio to mean that, because the aforesaid attorney was a "buddy" of members of the Waterfront Group, no complaints relating to this apparent fraud were to be made – otherwise, American would be subjected to brutal retaliation by those involved with organized crime.

179.    Upon information and belief, American's Premiums increased at least 20%, up to $100,000.00 each month (or $1.2 Million per year), constituting a significant economic burden to American.

180.    Upon information and belief, members of organized crime received "tributes," from, *i.e.,* a percentage of, the settlement of fraudulent insurance claims.

**E.      *Extortion and Labor Racketeering in Connection with the ILA's and Defendant Daggett's Insistence That American Permit the Addition of "No-Show" and "Low-Show" Labor to its Payroll***

181.    Under its CBA with American, the ILA is the party that assigns labor at the Terminals; the assignment of labor is supposed to be based upon the ILA's proper and good-faith assessment of the required workforce to service shipments and deliveries at the Port.

182.    Under the CBA, American has no control over the actual number of workers who appear at a specific dock worksite and whom American must pay.

183.    "No-show" and "low-show" jobs describes a method of artificially increasing payroll through the union's assignment of more labor than is necessary to perform work at the Port in order to artificially increase the employer's payroll to facilitate the union's laundering of funds for collateral objectives in violation of federal law.

184.    Since inception of American's work at the Port until American was ejected, the

---

claim filed by a Nicole Marinelli. Upon information and belief, members of the Waterfront Group have continued the activities in the place and stead of Ciccone.

ILA insisted that American accept more labor at the Port than the circumstances warranted.

185.    American strenuously resisted the ILA's insistence that American accept more labor at the Port than the circumstances warranted and engaged in "time and motion" enforcement in an ongoing effort to thwart the same.

186.    The additional workers ordered by the ILA would not show up for work or, if they did, would disappear for extended periods, but nonetheless, under the CBA, American would remain responsible to provide full pay as if such additional workers had worked the entire day.

187.    Over the years, the ILA used the no-show/low-show scheme at American's expense to divert the additional payroll to organized crime for the payment of "tributes" or "kickbacks."

188.    As Defendants continued their efforts to damage, and ultimately facilitate the ejectment of American from the Port, the ILA increased the number of workers by approximately an additional 20%, causing further economic and financial harm to American, consistent with the purpose of the Enterprise and the Scheme.

189.    As part of its business at the Port, American also operated a barge handling facility ("Barge Service") at the Newark Terminal, which effectuated the essential movement of foreign and interstate cargo across the Hudson River between the Newark and Brooklyn Terminals, so as to connect with railroad and/or interstate highway intermodal systems.

190.    In 2009, American was negotiating a new lease with the Port Authority with respect to, among other things, its tenancy at the Terminals.

191.    During American's lease negotiations with the Port Authority, the Port Authority withdrew funding for the Barge Service.

192.    The deficit in funding for the Barge Service was assumed by American.

40

193.   Upon information and belief, when Defendant Daggett learned that the Port Authority had cut funding to the Barge Service, he sought to make the Barge Service unaffordable for American to operate.

194.   To make the Barge Service cost-prohibitive to American, Defendant Daggett increased labor levels on the Barge Service with additional low-show and no-show jobs, rendering the unfunded Barge Service consistently unprofitable for American.

F.   *Labor Racketeering and Witness Retaliation against Sabato*

195.   From 1993 until September 2011 (when American was illegally forced out of the Terminals), American was a strident advocate for anti-corruption reform at the Port along the Waterfront.

196.   During the first quarter of 2011, the Waterfront Commission engaged in a series of public hearings regarding corruption and the proliferation of no-show and low-show jobs.

197.   In 2012, the Waterfront Commission issued a report addressing the issue of corruption at the Waterfront ("2012 Report").

198.   In the 2012 Report, the Waterfront Commission admonished the ILA for its failure to assure that Waterfront commerce is free from corruption and ties to organized crime, and more specifically condemning the endemic practice of no-show and low-show jobs.

199.   Sabato voluntarily participated in these hearings and testified before the Waterfront Commission, providing insight and facts regarding matters under the purview of the 2012 Report.

200.   ILA members were present at these hearings to watch Sabato's testimony and/or subsequently became aware of Sabato's testimony.

201.   Shortly after Sabato's aforesaid testimony, in retaliation against Sabato's

41

cooperation with law enforcement, Defendant Daggett threatened Sabato and told him, "you're finished in the port."

G.     *Loan Sharking*

202.   At all relevant times from 1993 until 2011, loan sharking was commonplace among the longshoremen at the Ports.

203.   To combat loan-sharking practices, American implemented and rigorously enforced an "no-loan-sharking" policy.

204.   American's "no-loan-sharking" policy and American's enforcement thereof was heavily resisted by the ILA.

205.   To enforce American's "no-loan-sharking" policy, in 2004-2005, American and in particular, Sabato, met with union officials and detectives from the Waterfront Commission to encourage enforcement action.

206.   Enforcement of the "no-loan-sharking" policy was also implemented by American's policing of the workplace; American's management and supervisors monitored the workplace for loan-sharking activity, such as workers loitering or lurking on payday, or fights near the main gates to the Terminals.

207.   On one occasion, in 2001, Frank "Red" Scollo, a former ILA Executive Vice President who later testified against organized crime figures during a labor racketeering trial, told Sabato: "I've told you, you're skating on thin ice.  You had better leave well enough alone."

H.     *Illegal Gambling at the Terminals*

208.   When American started as an MTO at the Terminals in 1993, it was commonplace for workers to place bets with other workers who were known as "bookies."

209.   In addition to being illegal, such misconduct frequently led to fights and threats of

violence among workers arising from the nonpayment of gambling debts.

210.   In the years 1993-2011, American enforced a "no gambling in the workplace" policy.

211.   To implement this policy, Sabato met with union officials and detectives from the Waterfront Commission to encourage enforcement action.   The enforcement was also implemented by self-policing of the workplace; American management and supervisors monitored the workplace for gambling activity such as card games, or evidence of individuals' "taking book."

212.   This "no gambling in the workplace" policy and American's enforcement thereof was heavily resisted by the ILA.

213.   At one point in 2004, Defendant Pernice told Sabato as follows: "... if you keep fucking bugging us about [gambling], you're gonna get knocked on your fucking ass.  It's not your business, stay out of it."

## HISTORICAL PATTERN OF RACKETEERING AND DEFENDANTS' PERPETRATION OF ADDITIONAL ILLEGAL ACTIVITIES TO ENRICH THE MEMBERS OF THE ENTERPRISE

214.   In addition to the recent flurry of extortionate acts in connection with the Waterfront Group's Scheme to force American out of the Port sector and to cause American to suffer economically and financially, members of the Waterfront Group and numerous others engaged in Waterfront Commerce with allegiances to organized crime, have been accused of, indicted for, and/or convicted of numerous other racketeering activities (*See* Civil RICO Action Complaint, Exh. 2).

215.   As reflected in the US RICO Action Complaint (Exh. 2), in furtherance of the conspiracy alleged therein, such activities included, among other things: (i) rigging the election

of *inter alia*, Defendant Daggett; (ii) implementation of fraudulent schemes designed to award valuable contracts to ILA members with ties to organized crime at the expense of other ILA members; (iii) fraud on the Local 1814 membership; and (iv) the extortion of allegedly injured longshoremen (in addition to the predicate act described *supra*, which specifically targeted American and was designed to inflate American's insurance rates as part of the Scheme).

## FIRST CAUSE OF ACTION

216.    American repeats and realleges the allegations set forth in paragraphs 1 through 215 as if set forth fully herein.

217.    Since in or about the year 1993, Defendants, together with other persons and organizations employed by and/or associated with the Waterfront Group, knowingly and intentionally combined, conspired, confederated, and agreed to commit offenses against American in violation of 18 U.S.C. §1962(c) (the "RICO Conspiracy"), that is, to conduct and participate, directly and indirectly, the affairs of the Waterfront Group through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §1961(1) and (5).

218.    The aforesaid pattern of racketeering activity consists of *inter alia*, the following predicate acts:

(i) extortion and labor racketeering in connection with Defendants' coercion resulting in American's execution of Succession Agreement, in violation of 18 U.S.C. § §1951-2;

(ii) extortion and labor racketeering in connection with Defendants' having coerced payment for, and directed the performance (or lack of performance) for low-show and no-show jobs by longshoremen, in violation of 18 U.S.C. §§1951-2;

(iii) extortion in connection with Defendants' coercion resulting in American's abandonment of its Demurrage claim, in violation of 18 U.S.C. §1951;

(iv) extortion, mail fraud, wire fraud, and labor racketeering in connection with Defendants' selective enforcement of alleged withdrawal liability in the SDNY and New Jersey Actions, in violation of 18 U.S.C. §§1341, 1343, and 1951-2;

(v) extortion, fraud, embezzlement, mail fraud, and labor racketeering in connection with the submission of false injury claims, interposed for the purpose of increasing American's Insurance Premiums, in violation of 18 U.S.C. §§1951-2, and 1931;

(vi) labor racketeering and witness retaliation in connection with statements made to Sabato after Sabato provided testimony to the Waterfront Commission regarding the presence of organized crime along the Waterfront, in violation of 18 U.S.C. §§1052 and 1513;

(vi) labor racketeering and "loan sharking," in violation of 18 U.S.C. §§891-894 and 1952; and

(vii) labor racketeering and illegal gambling, in violation of 18 U.S.C. §§1952, 1955 and 1084.

219.    It was further part of the RICO Conspiracy that the Defendants sought to command, in interstate and foreign commerce, profitability along the Waterfront for the benefit of the Waterfront Group at the expense of others, including various businesses, unions, and employees operating and/or working thereat, and to conduct and participate in the illegal affairs of the Waterfront Group.

220.    As a direct and/or substantial result of the aforesaid pattern of racketeering activity and the predicated acts committed in connection therewith, American sustained damages in an, as of yet, undetermined amount believed to be in excess of $20 Million.

## SECOND CAUSE OF ACTION

221.    American repeats and realleges the allegations set forth in paragraphs 1 through

45

220 as if set forth fully herein.

222.    Since in or about year 1993, Defendants, together with others, known and unknown, being persons employed by and associated with the Waterfront Enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally entered into the RICO Conspiracy in violation of 18 U.S.C. §1962(b), that is, to acquire or maintain, directly and indirectly, an interest in, or control of, the Waterfront Enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §1961(1) and (5).

223.    In furtherance of the RICO Conspiracy, Defendants, individually and in combination, committed the following predicate acts:

(i)    extortion and labor racketeering in connection with Defendants' coercion resulting in American's execution of Succession Agreement, in violation of 18 U.S.C. § §1951-2;

(ii)    extortion and labor racketeering in connection with Defendants' having coerced payment for, and directed the performance (or lack of performance) for low-show and no-show jobs by longshoremen, in violation of 18 U.S.C. § §1951-2;

(iii)    extortion in connection with Defendants' coercion resulting in American's abandonment of its Demurrage claim, in violation of 18 U.S.C. §1951;

(iv)    extortion, mail fraud, and wire fraud in connection with Defendants' selective enforcement of alleged withdrawal liability in the SDNY and New Jersey Actions, in violation of 18 U.S.C. §§1341, 1343, and 1951;

(v)    extortion, fraud, mail fraud, and labor racketeering in connection with the submission of false injury claims, interposed for the purpose of increasing American's Insurance Premiums, in violation of 18 U.S.C. § §1951, 1952 and 1931;

46

(vi)     labor racketeering and witness retaliation in connection with statements made to Sabato after Sabato provided testimony to the Waterfront Commission regarding the presence of organized crime along the Waterfront, in violation of 18 U.S.C. §§1052 and 1513;

(vi)     labor racketeering and "loan sharking," in violation of 18 U.S.C. §§891-894 and 1952; and

(vii)    labor racketeering and illegal gambling, in violation of 18 U.S.C. §§1052 and 1084.

224.    It was further part of the RICO Conspiracy that the Defendants sought to control and dominate the Waterfront, selected businesses and unions operating on the Waterfront, and to acquire or maintain, and illegally profit from, directly and indirectly, an interest in, or control of, the affairs of the Waterfront Group.

225.    As a direct and/or substantial result of, the aforesaid pattern of Racketeering Activity and the predicated acts committed in connection therewith, American sustained damages in an, as of yet, undetermined amount believed to be in excess of $20 Million.

### THIRD CAUSE OF ACTION

226.    American  repeats and realleges the allegations set forth in paragraphs 1-225 as if set forth fully herein.

227.    By means of the above-described acts, Defendants interfered with the business relations and/or customer shipping agreements between American and various other businesses involved in Waterfront Commerce.

228.    Defendants' interference with American's business relations was undertaken with the sole purpose of harming American, and was done through means of illegal, dishonest, unfair and improper means.

47

229.    By so interfering with American's business relations, the Defendants damaged American's prospective economic relations with third-party businesses, and caused economic harm to American.

230.    As a direct and substantial result of the foregoing, American is entitled to damages in an amount to be set at trial.

## DEMAND FOR RELIEF

**WHEREFORE**, American demands, pursuant to Section 1964 of Title 18 of the United States Code, the following relief:

as to the First Cause of Action, compensatory damages ($20 Million), trebled pursuant to §1964 of Title 18 to the United States Code, in an amount to be set at trial, believed to be in excess of $60,000,000, plus punitive damages in the amount of $100,000,000;

as to the Second Cause of Action, compensatory damages, trebled pursuant to §1964 of Title 18 to the United States Code in an amount to be set at trial, believed to be in excess of $60,000,000, plus punitive damages in the amount of $100,000,000;

as to the Third Cause of Action, compensatory damages in an amount to be set at trial;

all together with attorneys' fees and costs of this suit, interest, and such other and further relief as may be necessary and appropriate to prevent and restrain future violations of 18 U.S.C.

§1962 and to end the Waterfront Group's illegal control over, and exploitation of, the Ports and

the Brooklyn and Newark Waterfronts.

Dated: New York, New York
        February 6, 2013


                                        Weiss & Hiller, PC
                                        *Attorneys for Plaintiff*
                                        600 Madison Avenue
                                        New York, New York 10022
                                        (212) 319-4000


                                        Michael Hiller